IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

IRIS WEEKLEY, as Personal
Representative of the Estate of Jeffery
Weekley and on behalf of KATIE
WEEKLEY, as survivor,

      Plaintiff,

vs.                                                    CASE NO.: 5:12-CV-170-MW-CJK

HON. MICHAEL ADKINSON in his
capacity as Sheriff of Walton County;
and, NICK EMBRY in his individual
capacity,

      Defendants.

_____/

## DEFENDANT EMBRY'S MOTION FOR FINAL SUMMARY JUDGMENT

COMES NOW, Defendant, NICK EMBRY, individually, by and through undersigned counsel, pursuant to Local Rule 56.1(A), Northern District of Florida and Rule 56, Fed.R.Civ.P., hereby moves this Court to enter final summary judgment in his favor on all claims. In support, he says:

    1.    There are no disputed material facts, and based upon those undisputed material facts, Defendant EMBRY is entitled to judgment as a matter of law.

    2.    Deputy NICK EMBRY is entitled to qualified immunity on all excessive force claims made against him under the Fourth Amendment because he reasonably believed his life to be threatened during his brief encounter with decedent, Jeffrey Weekley, on August 3, 2009, and he used objectively reasonable force under the circumstances in defending himself. Nor was there any "clearly established" law

warning him that he could not act in self-defense when he faced what appeared to be a deadly threat under the circumstances.

## MEMORANDUM OF LAW

Pursuant to Rules 7.1(A) and 56.1(A), Local Rules for the Northern District of Florida, Defendant submits his Memorandum of Law in support of his Motion for Summary Judgment.

## I.   STATEMENT OF CASE AND MATERIAL FACTS

### August 3, 2009 Shooting

This case arises from a 911 call and officer-involved shooting at the residence of Ms. Mary Evelyn Burch at 533 Pope Street, Freeport, Walton County, Florida, shortly after 5:30 p.m., on August 3, 2009.  At 17:03 p.m., the Walton County Sheriff's Office dispatch center received a  911 call.  See, Exh. A (911 recording)[1]. Ms. Burch advised the dispatcher that Jeffrey Weekley had been living with her; that he had been drinking and that she was afraid; and, that she no longer wanted him at her home. Burch's fear and concern are self-evident on the related recording of the 911 call.  See, Exh. A (911 recording).  At 17:10 p.m., Mr. Weekley was reported to be "banging on the bedroom door" in an attempt to enter against Burch's wishes.  See, Exh. A; see also, Exh. B, Internal Affairs Report #09-32,  Summary of Transaction, p. 2; see also, CAD Report, Exh. C, p. 4 of 8.  Ms. Burch told the dispatcher that Weekley always carried a knife on him and such information was relayed to Deputy EMBRY. See, Id., Exh. C.

---

[1]The exhibits referred to herein are being separately filed in support of both ADKINSON'S Motion for Final Summary Judgment, See, Doc. 64, and this Motion.

Approximately five minutes later, Burch called back a second time after the line was disconnected. At 17:19, she told the dispatcher that Weekley was <u>outside</u> her residence with a chainsaw. See, Exh. B, p. 5; see also, CAD records, Exh. C, (showing EMBRY was 10-97 (at the location) at 17:25:44).

Deputy EMBRY'S understanding was that Ms. Burch had locked herself in her bedroom for safety and that Weekley was attempting to use the chainsaw to gain access. Exh. D, EMBRY Affidavit, ¶6. EMBRY then learned that Weekley had left the house and was outside near a shed with the chainsaw. Burch also confirmed to EMBRY that Weekley usually carried a pocket knife with him all the time. Exh. V, 10-23-12 Video deposition, Nick Embry; see also, Exh. D, EMBRY Affidavit, ¶8. Embry left the front porch of Burch's home with the intention of issuing a trespass warning if Weekley was still on the property. Exh. D, EMBRY Affidavit, ¶10.

First, he went to the shed at the rear of the home and found a hot chainsaw laying in the shed near the front door. See, Exh. D, EMBRY Affidavit, ¶10. To EMBRY, this confirmed Burch's story about the chainsaw being used by Weekley. He walked back toward the front of the residence, but then heard dogs barking in a dog pen near the northwest corner of the house. This caused him to investigate. <u>Id</u>. at ¶11; see also, Exh. E, Transcript of EMBRY'S 8-3-09 FDLE Sworn Statement, p. 4; Exh. E, p. 18 (EMBRY'S 8-3-09 diagram/drawing (not to scale)).

Due to palmettos and other brush, EMBRY could only see a short distance, but he heard a man's voice talking. He encountered Jeffrey Weekley laying on the ground with his hands in front of him, kind of like he was doing a pushup. Exh. D, ¶12.

3

EMBRY estimates he was originally about 35-45 feet or so away from Weekley when he first saw him.[2] As EMBRY approached Weekley's position, he said "I need to talk to you." Initially, Weekley jumped up and began running towards EMBRY yelling "Shoot me mother fucker, shoot me, shoot me. Blow my fucking brains out, blow my brains out." Id., ¶14. EMBRY drew his weapon in self-defense, at which time Weekley began to walk, instead of run. But Weekley continued approaching EMBRY. He continued to come forward despite repeated loud warnings to back up and get on the ground. EMBRY took two steps back in a tactical retreat. But, his right heel hit a small sapling or tree laying on the ground. Id., ¶14; see also, Exh. F (photograph showing approximate area from which EMBRY fired according to Plaintiff's expert, David Balash); Exh. G, FDLE computer-aided diagram.[3] EMBRY did not initially know what the object was that his foot had contacted. He could not retreat any further, however, without looking down (away from the approaching threat) or endangering himself further. Exh. D, ¶16.

EMBRY gave Weekley several loud commands to back up and to get on the ground. Exh. D, ¶14. Despite repeated loud commands and facing an armed officer, Weekley continued to come forward; loudly saying "Shoot me mother fucker." By then,

---

[2]His initial estimate, as reported to FDLE, was 35 ft. or so. See, Exh. E, Embry Interview transcript, p. 4. In his 2012 deposition, however, he indicated he thought Weekley was 40-45 ft. away. Exh. V, Video Deposition of Deputy Nick EMBRY, 10-23-12 (at approx. 19:00 mins.). The difference in estimated distance is not material. See, *infra.*

[3]Defendants do not concede that Exh. G accurately depicts the angle of the fallen branch/tree/sapling, as compared to Weekley's body. The "best evidence" of the actual angle is shown by the photograph in Exh. F.

Weekley was so close to EMBRY that EMBRY was concerned he could not even extend his arms.  He had to hold his hands and weapon close to his body/chest due to his fear that Weekley might attempt to disarm him.  Id, at ¶16.  Weekley shoved his hands deep down into his pockets and "bowed up" at EMBRY in a football-like stance (similar to a crouching tackler).  As Weekley started to pull his hands out of his pockets, EMBRY fired two rounds in a "double tap" fashion in self defense.  Id.

While EMBRY was outside looking for Weekley, Ms. Burch did not hear anything until she heard two shots in close succession "bam bam." Exh. H, Transcript of Mary Burch Interview with FDLE on 8-3-09, p. 6-7; see also, Exh. K, CD - Burch 8-3-09 recorded statement with FDLE.

| | |
|---|---|
| Special Agent Barry Hatton: | Once the officer went to that direction and got out of sight, did you see or hear anything else? |
| Mary Burch: | I didn't see, no until I heard the gunshots. |
| Special Agent Barry Hatton: | How many gunshots do you think you heard? |
| Mary Burch: | I believe I heard two (2) and they were close together, bam bam. |
| Special Agent Barry Hatton: | Like bam, bam? |
| Mary Burch: | Uh huh.[4] |

The CAD records show "shots fired" at 17:33:56.  Exhibit C, p. 4. Thus, approximately

---

[4]As shown *infra*, Burch's change of story concerning the lapse of time between the two shots is not a material fact dispute for purposes of summary judgment.

8 minutes elapsed from the time EMBRY arrived until he fired his weapon and reported it.   EMBRY'S actual encounter with Weekley only lasted a "matter of seconds." Exh. V, Video deposition of Deputy Nick EMBRY, 10-23-12 (at 21:50 - 22:03).

The autopsy was performed in Pensacola, Florida, on August 4, 2009, by Andrea N. Minyard, M.D.  See, Exh. I.  Dr. Minyard noted two gunshot wounds to the chest. See, Exh. I, signature page; Exh. I, pp. 2-3.  Wound 1 was at 55 ½" above the heel, centered in the anterior midline (directly over the sternum).   The projectile was recovered from Weekley's ninth thoracic vertebra. Id. "The hemorrhagic wound track sequentially perforates the [center of the] sternum at the level of the third anterior rib, the atria of the heart, the aorta and the esophagus." The autopsy report is not specific as to the downward angle. "The wound track travels from the decedent's front to back and downwards." Id. at p. 3.     The second gunshot wound to Mr. Weekley's chest entered approximately 1 ½" higher than the first wound, and approximately 1/4" to the left Weekley's anterior midline (center of his sternum). Id. at p. 3.  The path of the second wound was: "The hemorrhagic wound track sequentially perforates the sternum at the level of the first anterior rib, the aorta, the left lateral aspects of the eighth and ninth thoracic vertebra, and the lower lobe of the left lung." The autopsy report shows "The wound track travels from the decedent's right to left and downwards." There are no exact angles shown in the autopsy report; either vertically or horizontally.  Both of the wounds were very close together at the entrance points, and both of them either touched upon or ended at the ninth thoracic vertebra. Id. In the  toxicology report prepared as part of the autopsy, Weekley's blood alcohol content was found to be .161.

See, <u>Id</u>., at p. 8.

Plaintiff's proposed expert, Cyril Wecht, M.D., has opined that the lateral deviation between the two wounds was somewhere between 5 to 15 to 20 degrees (right to left). Exh. J, Wecht Depo., p. 44-45, ll. 19-25; 1-25. But, Wecht admits he cannot be sure of the actual deviation based on the information available to him. <u>Id</u>., at p. 46, ll. 1-7. See also, Defendants' First Motion in Limine - <u>Daubert</u> [Doc. 62].

In order to achieve the downward trajectories noted in the autopsy, "a person has to be bent over to allow for that kind of angularity to occur." Exh. J, at p. 32, ll. 14-16. "He could not have been standing upright." <u>Id</u>., at p. 33, ll. 7-8.[5] Either of the two wounds would have been fatal within just a few seconds to a "minute or two." <u>Id</u>., at pp. 19-20, ll. 8-25, 1-17. But, the wounds would not have prevented Weekley from moving from a bent to a standing position. <u>Id</u>., at p. 21, ll. 16-22.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

This Court previously explained the summary judgment standards in <u>Moghadam v. Morris</u>, 85 F. Supp. 2d 1255 (N. Dist. Fla. 2000). The Court said:

> "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,

---

[5]As separately shown in their Motion in Limine, Defendants respectfully move to exclude Dr. Wecht's opinion concerning the lateral variation in angles or the delay between the firing of the shots as being speculative and  not being based upon the actual facts of the autopsy; or, alternatively, based on facts not in the record.

322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986); Everett v. Napper, 833 F. 2d 1507, 1510 (11th Cir. 1987).

However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." Cornelius v. Highland Lake, 880 F. 2d 348, 351 (11th Cir. 1989), cert. denied, 494 U.S. 1066, 110 S. Ct. 1784, 108 L. Ed. 2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986). On summary judgment motion, the record and all inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. See, Souran v. Travelers Ins. Co., 982 F. 2d 1497, 1502 (11th Cir. 1993).

A party moving for summary judgment may discharge its burden by "showing there is an absence of evidence to support the non-moving party's case." Hansen v. Smallwood, Reynolds, Stewart, Stewart and Assocs., Inc., 119 F. Supp. 2d 1296, 1299 (M.Dist. Fla. 2000) citing Celotex, 477 U.S. at 323-325. "A court need not permit a case to go to a jury, moreover, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" Cuesta v. School Bd. of Miami-Dade Co., 285 F. 3d 962, 970 (11th Cir. 2002) (citations omitted). Instead, such inferences are drawn "only 'to the extent supportable by the record.'" Jean-Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010); Penley v. Eslinger, 605 F.3d 843, 848 (11th Cir. 2010). "Summary judgment should be granted when, after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." Nolen v. Boca Raton Community Hospital, Inc., 373 F. 3d 1151, 1154 (11th Cir. 2004) citing Celotex, 477 U.S. at 322; Jones v. Consuegra's Estate, 338 F. Supp. 2d 1282, 1288 (M. Dist. Fla. 2004). Furthermore,

as the <u>Hansen</u> court noted, "when a party's response consists of '[nothing] more than a repetition of his conclusional allegations,' summary judgment is not only proper, but required." <u>Id</u>, *quoting* <u>Morris v. Ross</u>, 663 F. 2d 1032, 1034 (11th Cir. 1981).

III.   <u>DEPUTY EMBRY IS ENTITLED TO QUALIFIED IMMUNITY FROM LIABILITY BECAUSE HIS USE OF FORCE WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES HE FACED; AND, ALTERNATIVELY, BECAUSE NO "CLEARLY ESTABLISHED LAW" ADVISED HIM HE COULD NOT DEFEND HIMSELF OR OTHERS IF HE MISTAKENLY BELIEVED HE WAS FACING AN ARMED SUSPECT AND NEEDED TO DEFEND HIS OWN LIFE.</u>

EMBRY'S tragic, but mistaken, belief that Weekley was drawing a weapon on him is not enough to establish liability against him under §1983. EMBRY used deadly force because, after retreating as far as he could go, and encountering a fallen sapling or branch, and facing a highly agitated man who was reported to be drunk and carrying a weapon, EMBRY mistakenly believed Weekley was in the act of pulling a knife against him. The law does not require EMBRY to wait to be stabbed before he defends himself. <u>Jean-Baptiste</u>, 627 F.3d 816, 821 (11th Cir. 2010) (officer not required to wait "and hope [ ] for the best.") "The law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." <u>Id</u>. Under the tragic, but undisputed facts of this case, EMBRY is entitled to qualified immunity for his use of deadly force in defending himself.

Qualified immunity is a substantive defense. It provides that government officials performing discretionary functions generally are shielded from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. <u>Vinyard v.</u>

Wilson, 13 F. 3d 1340, 1346 (11th Cir. 2002).   "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815 (2009).  To determine the propriety of qualified immunity, the official's conduct is evaluated under an objective, reasonable standard. Anderson v. Creighton, 483 U.S. 635, 107 S. Ct. 3034 (1987). The official's subjective intent is irrelevant to the inquiry. Graham v. Conner, 490 U.S. 386, 109 S. Ct. 1865 (1989).

Entitlement to immunity is the rule, rather than the exception. Lassiter v. Alabama A & M University, 28 F. 3d 1146 (11th Cir. 1994), *overruled in part on other grounds*, Hope v. Pelzer, 530 U.S. 730 (2002). The qualified immunity standard provides room for mistaken judgments by protecting "all but the plainly incompetent or those who knowingly violate the law." Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 2157 (2003), *receded from on other grounds*, Pearson, 555 U.S. 223 (permitting courts to exercise discretion in deciding which prong of qualified immunity analysis to consider first).   Only in the most exceptional cases will government actors have no shield against claims made against them in their individual capacity. Lassiter, 28 F. 3d at 1149; Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Courts should "think long and hard before stripping defendants of immunity" because qualified immunity protects government actors in all but exceptional cases. Id.

In order to invoke this substantive defense of qualified immunity, a defendant must first prove that he was acting within the scope of his discretionary authority at

the time of the alleged wrongful conduct. Zeigler v. Jackson, 716 F. 2d 847 (11th Cir. 1983). Here, there can be no reasonable dispute. EMBRY was acting within the normal scope of his duties as a "road patrol" deputy for the Walton County Sheriff in responding to the distress/911 call in question. Then, the burden shifts to the plaintiff to demonstrate that the defendant's conduct violated clearly established law.[6] See, e.g., Id.; Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009); see also, Penley, 605 F.3d at 854 (ending qualified immunity analysis upon finding no constitutional violation).

Qualified immunity is a matter of law for the Court to determine. Post v. City of Ft. Lauderdale, 7 F. 3d 1552, 1557 (11th Cir. 1993), modified, 14 F. 3d 583 (11th Cir. 1993). The defense is available even if the actions taken by a law enforcement officer are mistaken. Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009) ("The protection of qualified immunity applies regardless of whether the government official's error is a 'mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"); Gold v. City of Miami, 121 F. 3d 1442, 1446 (11th Cir. 1997). Where an officer has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff. "This burden is not easily discharged . . . plaintiffs cannot carry their burden of proving the law to be clearly established by stating constitutional

---

[6] Only cases from the United States and Florida Supreme Courts and the Eleventh Circuit Court of Appeals can create "clearly established law" for qualified immunity purposes. Jenkins v. Talladega City Bd. of Education, 115 F. 3d 821, 835 n. 4 (11th Cir.), cert. denied, 118 S.Ct. 412 (1997); Ensley v. Soper, 142 F. 3d 1402, 1407 n. 5 (11th Cir. 1998).

rights in general terms." Foy v. Holston, 94 F. 3d 1528, 1532 (11th Cir. 1996); Riddle v. Secretary, Dept. of Corrections, 2008 WL 4790516 (M.Dist. Fla. 2008). Plaintiff cannot carry *either* burden here. First, the facts of this case do not establish a constitutional violation. Secondly, there was no clearly established law as of August 3, 2009, advising EMBRY that he could not fire in self-defense.

In determining whether qualified immunity applies, a court must apply a two-part test. Pearson v. Callahan, 555 U.S. at 815-818. The court must determine whether the facts, taken in the light most favorable to the Plaintiff, would show that a constitutional violation even occurred. Saucier, at 201, 121 S. Ct. at 2156; Gonzalez v. Reno, 325 F.3d 1228, 1234-36 (11th Cir. 2003). The second prong of the qualified immunity analysis is to decide, if the allegations would show that a constitutional violation has occurred, if the plaintiff's rights were "clearly established - - that is, whether it would have been clear to a reasonable officer that [the Defendant's] conduct was unlawful." Id. at 202, 121 S. Ct. at 2156; Gonzalez, 325 F. 3d at 1234. The district court may use its discretion to decide in which order to consider each prong based on the facts of the case. Pearson, 555 U.S. at 236, 129 S.Ct. at 818; Penley, 605 F. 3d at 854.

All excessive force claims under the Fourth Amendment are analyzed under Graham v. Conner, 490 U.S. 386 (1989). There, the Court said:

> The "reasonableness" of a particular use of force must be judged from the prospective of a reasonable officer on the scene, rather than with the 20-20 vision of hindsight . . . the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain and

> rapidly evolving — about the amount of force that is necessary in a
> particular situation.
>
>                                  . . . .
>
> The "reasonableness" inquiry in an excessive force case is an objective
> one:  the question is whether the officers' actions are "objectively
> reasonable" in light of the facts and circumstances confronting them,
> without regard to their underlying intent or motivation . . . an officer's
> evil intentions will not make a Fourth Amendment violation out of an
> objectively reasonable use of force; nor will an officer's good intentions
> make an objectively unreasonable use of force constitutional.

Graham, 490 U.S. at 396-97.  "In making an excessive force inquiry, we are not to view

the matter as judges from the comfort and safety of our chambers, fearful of nothing

more threatening than the occasional paper cut as we read a cold record accounting of

what turned out to be the facts."  Crosby v. Monroe Co., 394 F. 3d 1328, 1333-34 (11th

Cir. 2004).  "We must see the situation with the eyes of the officer on the scene who is

hampered by incomplete information and forced to make a split-second decision

between action and inaction in circumstances where inaction could prove fatal." Id.,

*citations omitted;* See also, Penley, 605 F.3d at 848-50.

Every case involving alleged excessive use of force needs to be evaluated on the

totality of its circumstances.  "Perspective also is crucial to the analysis:  '[t]he only

perspective that counts is that of a reasonable officer on the scene at the time the

events unfolded.'" Jean-Baptiste, 627 F.3d at 821, *quoting* Garczynski v. Bradshaw,

573 F.3d 1158, 1166 (11th Cir.2009).  Courts should not allow the facts of rapidly

evolving arrests to eviscerate and make the qualified immunity doctrine meaningless.

"The purpose of the qualified immunity doctrine is to give meaning to the proposition

that 'government officials are not required to err on the side of caution' when it comes

to avoiding constitutional violations." e.g., <u>Marsh v. Butler Co.</u>, 268 F. 3d 1014, 1030, n. 8 (11th Cir. 2001).

An officer's mistaken use of force needs to be considered on a case-by-case, fact-specific basis.  See, <u>Graham</u>, 490 U.S. at 396-97; <u>Jean-Baptiste</u>, 627 F.3d at 821 ("Officer . . . was entitled to qualified immunity if he 'reasonably *could have* believed that probable cause existed, in light of the information [he] possessed[,]' to shoot [Weekley], even if that belief was mistaken."), p. 6, *emphasis added*; <u>Carr v. Tatangelo</u>, 338 F.3d 1259 (11th Cir. 2003) ("An officer is entitled to qualified immunity if a reasonable officer, under the circumstances, might have thought that the use of force did not violate the federal law at the time of the incident.").  "Regardless of whether probable cause actually existed, if a reasonable officer possessing the same particularized information as [the subject officer] *could* have, in light of <u>Garner</u>, believed that his conduct was lawful, then [the officer] is entitled to qualified immunity." <u>Carr</u>, 338 F.3d at 1269, n. 19. "'Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer.'" <u>Carr</u>, 338 F. 3d at 1270, n. 20; See also, <u>Reese v. Anderson</u>, 926 F. 2d 494 (5th Cir. 1991) (where officer shot occupant in the head at a distance of approximately 10 feet and killed him because he thought he was reaching for a gun that would place the officers in danger); See also, <u>Slattery v. Rizzo</u>, 939 F.2d 213 (4th Cir. 1991) (officer fatally shot suspect who failed to respond to commands and had his hand partially closed around an unknown object that turned out to be a beer bottle).

14

Slattery is particularly informative.  There, Slattery, the suspect, did not respond to "at least two" commands to raise his hands.  Slattery, 939 F.2d at 215. Officer Rizzo could not see the suspect's hands.  He kicked at the car door window in which Slattery was seated.  Id.  "By this time, Officer Rizzo had drawn his service revolver.  He could not see Slattery's left hand clearly.  This was the hand away from the officer."  Id.  Rizzo observed Slattery's hand partially closed around an unknown object (which later turned out to be a beer bottle). When Officer Rizzo believed Slattery was coming at him with a weapon, he shot Slattery once in the face with his revolver. There, even though Rizzo was mistaken in believing that Slattery was coming at him with a weapon, the Fourth Circuit found that he was entitled to qualified immunity because "a reasonable officer could have had probable cause to believe that [Slattery] posed a deadly threat and therefore would be authorized to use deadly force."  Id. 933 F.2d at 216-17.

Here, EMBRY has testified unequivocally that he was informed that Weekley ordinarily carried a knife in his pants or shorts.  The radio records of the incident confirm that EMBRY had been so advised.  EMBRY had been told by dispatch and Burch that Weekley was drunk.  This was confirmed by the autopsy.  Weekley's BAC was 0.161, in the autopsy blood test results.  Exh. I, p. 8.  Weekley was acting irrationally and refused to follow repeated loud commands from EMBRY.  Once EMBRY had backed up as far as he could safely retreat, he fired in self-defense only when he feared for his life and Weekley had "bowed up" at him in a football-like stance that appeared Weekley  was, in fact, preparing to disarm EMBRY; or, attack him,

15

perhaps with a knife. Under those facts, *any* reasonable officer would have fired in self-defense and it simply is not a constitutional violation for EMBRY to defend himself.

EMBRY'S use of deadly force was surely tragic, but also objectively reasonable. See, <u>Loch v. City of Litchfield</u>, 689 F.3d 961, 966-67 (8th Cir. 2012)(officer who was initially told suspect was armed, shot an unarmed man eight times when suspect kept approaching, despite repeated commands to halt was entitled to qualified immunity because officer's acts were objectively reasonable). A uniformed officer who draws his weapon and points it at a suspect after he has been told someone is armed, and faces the suspect's "escalation of the situation" does not need to give any separate warning that he is about to fire. <u>Loch</u>, 689 F.3d at 967. In fact, an officer in such a situation "is in no position" to verify whether the suspect is armed or not. <u>Id</u>; see also, <u>Penley</u>, 605 F. 3d at 854, n. 6.

The result should be exactly the same in this case; particularly given the strong deference to law enforcement officers' split-second decisions that frequently have to be made in the use of deadly force. It is no wonder that there was no clearly established law on August 3, 2009, which would warn EMBRY that he could not fire in self-defense. Here, unlike <u>Loch</u>, EMBRY had no conflicting information at the moment he shot concerning whether Weekley was armed. The only thing EMBRY "knew" was that he had tried to retreat; the suspect was reported to be armed; refused to comply with his loud verbal orders; kept advancing upon an armed officer in uniform; and, was so close to him that EMBRY could not even safely hold his arms in an extended position.

16

EMBRY is entitled to qualified immunity because a reasonable officer on the scene could have believed Weekley constituted a deadly threat to the officer. Penley; Carr; Jean-Baptiste; Crosby; Loch; Slattery. If so, any reasonable officer would have acted to defend himself/herself.

There is an immaterial discrepancy in the initial distance between Weekley and EMBRY according to EMBRY'S current memory of the encounter. In his statement to FDLE, he stated he thought it was approximately 35 feet or so between himself and Mr. Weekley when he first saw Weekley. Exh E, p. 4. Now, however, EMBRY remembers it as being 40-45 feet. Exh. D, ¶14; see also, Exh. V at approx. 19:00 mins. The slight difference in estimating distances is immaterial to the resolution of this cause. Anderson, 477 U.S. at 248. Whether Weekley was 35 feet away or 45 feet away doesn't matter. What matters is that Weekley rushed a uniformed officer despite EMBRY'S commands, was enraged, and appeared ready to assault EMBRY with a deadly weapon. So, whether Weekley ran approximately 25 feet or 35 feet to get to the final point of separation between himself and EMBRY does not make a difference to the Court's analysis of either the federal or state claims.

IV.   **CONCLUSION**

In this case, there is a complete absence of any competent evidence supporting the Plaintiff's federal claims against EMBRY in Count I. EMBRY is entitled to qualified immunity because he believed, under all the circumstances that he perceived in the moments before he shot, that he was facing a deadly threat. Under such circumstances a reasonable officer could have thought deadly force was authorized in

17

defending himself. Nor is there a qualifying case setting forth "clearly established" law that an officer cannot fire in self-defense when perceiving a deadly threat during the course of an escalating threat with an enraged, intoxicated suspect. Therefore, EMBRY is entitled to qualified immunity under both prongs of the Pearson qualified immunity analysis. Summary Judgment should be entered on behalf of EMBRY on settled qualified immunity grounds.

Respectfully submitted this 9th day of April, 2013.

/s/ Carl R. Peterson, Jr.
CARL R. PETERSON, JR.
Florida Bar No. 0980048
JOLLY & PETERSON., P.A.
Post Office Box 37400
Tallahassee, Florida 32315
Telephone: 850-422-0282
Fax: 850-422-1913
E-Mail: crp@jollylaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by CM/ECF only to James Cook, Esq., 314 West Jefferson Street, Tallahassee, Florida 32301 and W. David Bennett, Esq., Ellis, Ged & Weekley, P.A., 7171 North Federal Hwy., Boca Raton, Florida 33487 this 9th day of April, 2013.

/s/ Carl R. Peterson, Jr.
CARL R. PETERSON, JR.

cc:  Walton County Sheriff's Office, Attn: Maj. Fountain/Henry Alford
     Fla. Sheriff's Risk Management Fund, Attn: Shelly Marks, Esq.
     Nick Embry