IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

IRIS WEEKLEY,

    Plaintiff,

vs.

HON. MICHAEL ADKINSON, et al.,

    Defendants.

Case No. 5:12cv170-MW-CJK

**PLAINTIFF'S FIRST MOTION IN LIMINE (DAUBERT) TO
EXCLUDE OR LIMIT THE OPINIONS OF GARY A. RINI**

COMES NOW the Plaintiff, IRIS WEEKLEY, through undersigned counsel, pursuant to the applicable Federal Rules of Civil Procedure and Federal Rule of Evidence 702, and move for a ruling in limine to exclude or severely limit the proposed testimony of their expert, Gary A. Rini, and as grounds would show:

1. Gary Rini offers opinions contrary to the evidence.

2. Gary Rini fails to support his opinions by relating them to supporting evidence so that they are no more than conclusory.

3. Gary Rini "deforms" the evidence to reach his conclusions.

Gary A. Rini reviewed evidence provided to him by counsel for Defendants and after a discussion of the evidence, rendered a single identified conclusory opinion:

> *[T]hat the account of the circumstances surrounding Jeffrey Weekley's death that was provided by Deputy Sheriff Nick Embry is supported by the facts and physical evidence contained in the documents, photographs, and case materials submitted for evaluation.*

1

In getting to that opinion, Mr. Rini makes a number of errors which render his report unreliable or irrelevant or both.

A. **Jeffrey Weekley's Movements and Posture When He Was Shot**

In his Expert Report, **Exhibit A**, Mr. Rini apparently bases his construction of the shooting primarily on Deputy Embry's account to the Florida Department of Law Enforcement just after the shooting. Embry made the following statements to FDLE:

> [Jeffrey Weekley] was laying on his stomach with his elbows down on the ground, keeping his chest off the ground. He was looking to the south in my direction. Um, as I approached, um, a little bit closer, I told him, I said I need to talk to him. At that point, he jumped up and, um, started going east to clear the trees. As soon as he cleared the limbs of the trees, he started, um, running directly in, in my, towards me, um, in which I drew my weapon and told him to get back. Um, when I did that, he, he started bowing up and his, he was looking at me and just looking at me and saying, 'shoot me motherfucker, shoot me, shoot me, blow my fucking brains, blow my brains out.' And he's clinching his fist and bowing up and he's continually, when I drew my weapon he quit running, but he was coming at a steady walk as he was bowing up, 'shoot me motherfucker, shoot me. And I told him to get back and, um, 'get back, get back,' and he keeps coming, 'shoot me motherfucker.' Well, I take two, approximately two steps back where my heels hit, um, later I found out it was a small tree that had fallen, my heels hit that, I didn't know what it was. I knew I couldn't go back any further and he kept approaching, 'shoot me mother fucker,'' and then I told him, 'keep your hands where I can see 'em and get back.' He, at that point, he took, as if he was just deliberately doing it, he took his hands, shoved them down deep in his pockets and he bowed up at me and kept coming. He took approximately two more steps. He said 'shoot me motherfucker' and he had both his left and his right hands in his pockets. Um, he covered um, approximately one more step and I fired two rounds. Um, he fell to the ground. Um, he fell to the ground.

D.E. 65-5, FDLE Interview with Nicholas Embry, August 3, 2009, page 4.

Deputy Embry goes on to say, in response to questions, that Weekley started out about 35 feet away and stopped running at 10-12 feet away. Id., page 8. He says

Weekley had a white tee shirt in his right hand. Weekley was "leaning forward." Weekley was saying, "shoot me motherfucker, blow my brains out." Weekley would take a step forward every time he said this and he would "bow forward" every time he said it. Embry says, "Well, he drops his shirt and he takes both hands at the same time, simultaneously, and sticks 'em in his right front pocket and his left front pocket and that's when he, he just keeps leaning forward with his hands in his pockets saying, 'shoot me motherfucker.'" Id., pages 8-9. Embry said Weekley was about 6-8 feet way when he fired two rounds simultaneously and Weekley fell backwards. Id., page 10.

In his report, Rini departs from Embry's account to FDLE. Rini says that at the moment Embry shot him, Weekley was "withdrawing his hands from his pockets as he was bent forward and charging at Embry." According to Embry's audio-recorded FDLE interview, Weekley's hands were still in his pockets when Embry fired. Embry did ultimately claim Weekley was taking his hands out of his pockets when he fired by the time of his deposition October 23, 2012. There, Embry testified, "[W]ell, at the time he had his hands in his pocket, as soon as he started to come out, is when I fired. Doc. 79-6, Deposition of Nicolas Embry, page 29, lines 7-9.

Defendants' pathologist, Dr. Kris Sperry, writes that, based on the penetration of the aorta by both bullets, Mr. Weekley would have exsanguinated almost immediately with blood spurting from the chest wound and from the left lung up through Weekley's nose and mouth. Doc. 79-5, Sperry Report, page 3.

After Weekley was shot, Rini states "Weekley then fell backwards, initially clutching at his chest, and then ended on the ground with his arms extended outward." **Exhibit A**, Rini report, page 3.

**B. The Track of the Bullet Wounds Through the Body**

Mr. Rini recites from the Autopsy Report that one gunshot wound track is "from the decedent's front to back and downwards" and that one gunshot wound track is from "right to left and downwards." He publishes a drawing of a human rib cage and brackets the area where the bullets end up as being substantially below their entrance point but does not attempt to quantify the downward or leftward angles or to suggest how angles comport with the other evidence. **Exhibit A**, Rini Report.

Plaintiff's experts, David Balash and Dr. Cyril Wecht, together with Defendant's pathologist, Dr. Kris Sperry, agree that the downward track of the wound is around 40 to 45 degrees, approximately diagonal. Dr. Wecht believes it may have been more. Doc. 80-1, Wecht Report, paragraph 1. Mr. Rini and Dr. Sperry explain the diagonal track of the wound by opining that it was due to the extreme angle at which Mr. Weekley was leaning forward when he was shot. At his deposition, Deputy Embry had demonstrated holding his gun at about chest level when he fired. Doc. 79-7, Embry photos, page 1. Embry is 6 feet tall. **Exhibit B**, Embry Employment Application. Weekley was 5 feet, 11 inches. Doc. 65-9, Autopsy Report, page 1. So the two were about the same height, standing. Mr. Weekley would have had to have been leaning forward at close to a 40-45 degree angle to explain that angle of wound track.

Plaintiff's experts David Balash and Dr. Cyril Wecht explain the 40 to 45 degree downward wound track by opining that Mr. Weekley had to be down on the ground when he was shot. Both experts are adamant that Mr. Weekley could not have been leaning forward to the necessary extent, as well as moving with forward momentum, and still end up falling on his back. Doc. 80-1, Wecht Report, paragraph 3, p. 2, Doc. 65-10, Deposition of Cyril Wecht, pp. 32-33; Doc. 80-2, Balash Report, page 7, Doc. 79-4, Balash Report Supplement, page 1.

### C. Blood Spatter Evidence Suggesting Position at Time of Shooting

All the experts agreed that Mr. Weekley clutched his chest upon being shot and did so quickly enough that a part of his chest, showing a V-pattern, was entirely free of any blood spatter. This creates a problem if Mr. Weekley's hands were still stuck deep in his pockets at the moment he was shot, as Deputy Embry initially testified to FDLE. Defendant's pathologist, Dr. Sperry, stated that with two bullets going through the aorta, Mr. Embry would have bled out through his chest and through the lungs to the mouth and nose, and causing "extremely rapid incapacitation." Doc. 79-5, Report of Dr. Kris Sperry, page 3. Mr. Weekley had to be able to hug his chest almost at the instant he was shot, before his hands fell away to the ground as he lay on his back. See Doc. 80-4, Weekley photo at scene, page 1, 2.

Mr. Rini then suggests that the pattern of blood spatter on Mr. Weekley's face shows that he had to be bent over and "exposed to the blood source the moment the blood left decedent's chest." Exhibit A, Rini Report, page 17. Rini seems to believe

Mr. Weekley *had* to be bent over forward to have blood splash on his face. In his report, page 9, top photograph, Mr. Rini shows yellow dotted lines radiating up from the chest to the face to explain the heavy blood spatter on the bottom part of the face. Exhibit A, Rini Report, page 9. This ignores the fact that Mr. Weekley's lungs had filled up with blood and he would have been aspirating blood from his mouth and nose. Defendants own pathologist, Dr. Kris Sperry, explained:

> [T]he missile that penetrated the left lung would also have caused blood to rapidly fill the airways and Weekley would cough the blood out during agonal breathing. The combination of blood coming from the chest wounds and his mouth and nose created the extensive blood spatter that is seen in the scene photographs of Weekley's body prior to being moved.

Doc. 79-5, Sperry Report, page 3. The more likely scenario is that Mr. Weekley was on his back coughing blood from his mouth and nose which fell back onto his face and chest, causing the spatter that appears in the photographs. Certainly Weekley didn't necessarily have to be bent over with his face opposite his chest wound.

### D. Cartridge Ejection Pattern Indicating Location of Shooter

Deputy Embry puts himself 6-8 feet away from Mr. Weekley when he fired. In his diagram of the shooting scene, Deputy Embry draws himself at the far end of the fallen sapling. Doc. 65-5, FDLE Interview, page 18. From there, his two empty shell casings would have ended up to his left. Plaintiff's expert, David Balash, did a series of cartridge ejection tests using Deputy Embry's gun and the same ammunition used by Embry. The tests showed that the empty shell casings should have fallen on the opposite side, several feet to Embry's right, and a few feet behind Embry. Mr. Balash

6

places Embry much closer to where Mr. Weekley's body was found, a few feet to the left of the shell casings (indicated as markers 3 and 4). **Exhibit C**, Photograph with Blue Circle Indicating Embry's Probable Location, Exhibit 2 to David Balash Deposition. In his cartridge ejection pattern tests, cartridges fell about 8 to 12 feet to the right of the shooter. When Balash fired at a downward angle, the shell casings fell within 5 to 7 feet of the shooter, or about where Embry's cartridge casings were actually found, if the shooter were standing where Balash suggests. Doc. 79-3, Balash Report, Cartridge Ejection Pattern Tests, page 9 and 10. Mr. Balash notes that the autopsy does not indicate any soot or gunpowder particles which would have been present if the gun had been fired from closer than 30-36 inches. Doc. 80-2, Balash Report, page 5. Dr. Wecht opines that the shots were fired from a distance probably greater than 24 inches. Doc. 80-1, Wecht Report. The shooter could have been standing much closer to Mr. Weekley than the 6-8 feet claimed by Deputy Embry.

Mr. Rini's only response is to criticize the cartridge ejection pattern tests, quoting from a November 2010 study by Bill Lewinski,[1] "Fired Cartridge Case Ejection Patterns from Semi-Automatic Firearms," Investigative Sciences Journal, Vol. 2, No. 3, that cites "significant inconsistency of the spent cartridge case ejection

---

[1] It is worth noting that the lead author, Bill Lewinski, is not a ballistics expert at all, but a police psychologist and executive director of Force Science Institute, a litigation expert company that works only for police and police agencies. Lewinski received his Ph.D. from a correspondence school and has frequently been accused of fostering "pseudo-science" to defend police in questionable situations. Lewinski was limited from attempting to express opinions relating to the subject of the above study in Tubar v. Clift, 2:05-cv-1154 (W.D. Wa.), Doc. 346. **Exhibit D**.

locations that occurred across test positions even when several factors including firearm type, firearm position, and ammunition were accounted for." Rini also raises differences in terrain as a factor not accounted for although photographs show that both the shooting site and the range were flat ground. Mr. Rini doesn't suggest what other factors come into play or how 20 test shots with ejection patterns several feet to the right of and a few feet behind the shooter's position lack evidentiary value in assessing the likelihood that both Embry's cartridges ended up close together to his left and in front of him, as suggested by Deputy Embry's scene diagram.

Mr. Rini also questions Mr. Balash's opinions (1) that Embry should have used less lethal force (which Rini dismisses because Mr. Weekley was known to carry a pocket knife); (2) that Mr. Balash misunderstood Florida law on lethal force; (3) that Balash made some error with regard to Deputy Embry's "tactical slide" (which Rini does not elaborate); and (4) that Rini did not find any evidence for the employment of a "Total Station" for scene measurements by FDLE agents.[2]

## MEMORANDUM OF LAW

A District Court's ruling on admissibility of expert testimony is reviewed for abuse of discretion. *General Electric Company v. Joiner*, 522 U.S. 136, 138-39, 118 S.Ct. 512 (1997). Rule 702, Federal Rules of Evidence, provides:

---

[2] A "Total Station" is a electronic device on a tripod, used primarily by surveyors, that uses an electronic distance meter (EDM) to make line of sight measurements of distances.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Federal courts act as a gatekeeper to ensure that scientific expert opinion evidence is both "relevant and reliable." *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579, 589 (1993); See also Rule 104(a), Federal Rules of Evidence ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.").

Rule 702 also requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." An additional consideration is whether the expert testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.

One factor traditionally applied to determine "whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Id.* at 593. Another "relevant though not dispositive, consideration" is whether the technique or methodology has been peer-reviewed. Another is the known or potential error rate. *Id.* at 594. Finally, although "general acceptance" is no longer the *sine qua non* of admissible expert opinion, it can be considered. *Id.* at 594-95. Other rules of evidence can have effect too, including the rules against hearsay and undue prejudice, since "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* at 595.

In *Kumho Tire Company, Ltd. V. Carmichael*, 526 U.S. 137, 147 (1999), the Court clarified that the courts' gatekeeping role applied not only to "scientific" testimony but to *all* expert testimony. The Court held that there was no clear line that divides "scientific" knowledge from "technical" or "other specialized knowledge," that the concepts are inter-related, and that from a legal standpoint, there is no convincing need to make a distinction based on these differences. *Id.* at 148.

**A.  The Problems Raised by The Physical Evidence**

The primary forensic problems in this case are (1) how Mr. Weekley, leaning forward and with forward momentum, ends up on his back after he is shot;[3] (2) how Mr. Weekley, with his hands jammed deep in his pockets, is able to hug his chest with his arms after being shot so that not of drop of his spurting and aspirated blood ends up on a v-shaped area of his chest, despite his almost instantaneous incapacitation from rapid loss of blood; and (3) how Deputy Embry's empty shell casings end up on the ground to the left and in front of where Embry says he was standing when a shell

---

[3] Although Mr. Rini has not opined Deputy Embry's bullets could have "knocked" Mr. Weekley backwards from a forward-moving, forward-leaning stance, that has become the elephant in the room in this case. See "On the physics of momentum in ballistics: Can the human body be displaced or knocked down by a small arms projectile?" International Journal of Legal Medicine, 1996, Volume 109, Issue 3, pp. 147-149, (the peer-reviewed journal of the International Academy of Legal Medicine) explaining that small arms, including large caliber rifles and a 12-gauge shotgun, only result in a backwards motion of a 80 kg target body of 0.01 to 0.18 m/s, which is negligible compared to the velocity of a pedestrian (1-2 m/s), and further that counterbalance is constantly maintained by neurophysiological reflexes so that the effect of the momentum transferred from the missile is virtually zero and there is no backwards motion of the person shot. **Exhibit E**.

cartridge ejection pattern test using Deputy Embry's gun and ammunition shows all 20 shell casings several feet to the right and behind the shooter's position.

1. **The Angle of the Wound Track.**

Most of the experts agree, and no expert disputes, that the angle of the wounds were 40-45 degrees downward from front to back (with the exception that Dr. Wecht believes the angle could have been steeper). In his Report, Mr. Rini opines that the angle was achieved by the fact that Mr. Weekley was bent forward. According to Mr. Rini, Mr. Weekley was bent forward and charging forward at the moment he was shot. Mr. Rini concedes that Mr. Weekley fell on his back after being shot, as testified to by Deputy Embry, but Rini does not explain how a person who is "bent forward and charging" with forward momentum ends up lying on his back after being shot. Thus there ends up being no "fit" between Mr. Rini's theory and the evidence in the case.

Without explaining the anomaly of the alleged forward projection and momentum of Mr. Weekley and the backward collapse of his body, Mr. Rini seeks to bolster his forward-leaning theory by saying that Mr. Weekley's head, bending forward, explains the heavy spatter of blood on the lower part of Mr. Weekley's face, as shown in a photograph of Mr. Weekley at the scene, 80-4, Weekley photo at scene, page 1, and Mr. Rini's own report, Exhibit A, page 17. This theory ignores the fact, explained in the autopsy report, Doc. 65-9, page 3-4, that the chest cavity held nearly two liters of blood and Mr. Weekley's mouth was full of blood, suggesting that blood had filled the airways through the lung perforation and that Mr. Weekley was

coughing and aspirating blood from his mouth and nose, as confirmed by Defendant's pathologist, Dr. Kris Sperry. Doc. 79-5, page 3. Once again, Mr. Rini's theories to not make a "fit" with the known evidence.

### 2. The Blood Spatter Patterns on Mr. Weekley's Chest

In his initial statement to the Florida Department of Law Enforcement, Deputy Embry said that Mr. Weekley's hands were not just shoved in his pockets, but shoved *deep* in his pockets when Deputy Embry fired two shots. This element of the story is important to Deputy Embry because Mr. Weekley was first reported to have carried only a white tee shirt and died empty-handed. No weapons were found anywhere on his person. The only hint of threat is that he was alleged to have put his hands in his pockets where he was thought to carry a pocket knife.

But this is also a problem for Deputy Embry because not only were Mr. Weekley's hands flung to either side of his body when he was found but the absence of blood spatter on a v-shaped portion of Mr. Weekley's chest suggests that he was hugging his arms to his chest at virtually the moment he was shot and began spurting and coughing blood. This problem, Mr. Rini resolves by attributing to Deputy Embry in his initial statement something that Deputy Embry was not recorded as saying until his deposition more than three years after the shooting, that Mr. Weekley was starting to draw his hands *out* of his pockets when he was shot by Deputy Embry.

As a further problem, Deputy Embry in his play-by-play for FDLE never describes Mr. Weekley as clutching his chest at all. Deputy Embry says, "His left arm,

when he fell back, both arms come up, his left arm stayed raised in the air, um, from the, his elbow was on the ground, but his left arm stayed raised in the air and then slowly it fell to the , um, to the side. Doc. 65-5, FDLE Interview, page 11.

Perhaps based on the same wish to substantiate the claim that Mr. Weekley had his hands in his pockets and pulled them out quickly, Mr. Rini makes a feature on page 14 of his report, a photograph showing Mr. Weekley's shorts pockets turned out. In fact, FDLE photos show forensic investigators went through Weekley's pockets at the scene and by the time of the autopsy, his pockets were tucked neatly back in. **Exhibit F**, Photographs of Pocket Contents Inventory and pockets prior to autopsy.

Here again, Mr. Rini seeks to force the glass slipper onto the ugly stepsister's foot by means that are unfounded or unreliable.

### 3. Shell Casing Trajectory Patterns

The two theories of the shooting in this case are emphatically different. One version has Mr. Weekley advancing on Deputy Embry with threatening movements until Deputy Embry can back up no further and has to fire from around 6-8 feet in self-defense. The other version has Deputy Embry much closer, standing over Mr. Weekley and firing downward, execution-style. In the latter version, there is no threatening forward momentum, no exigency of Embry's being "trapped."

Plaintiff's ballistics expert, David Balash, using Deputy Embry's firearm and the same type of ammunition, on level ground not unlike the ground visible in the scene photos, fires 20 rounds and marks where each shell casing strikes the ground,

13

with reference to a point zero, where Balash holds the gun. The first two sets of eight rounds describe a pattern in which the empty shell casings are ejected from 8 to 12 feet to the right and 7 to 11 feet behind the zero point. In a final set of four rounds, Balash fires, also from point zero, but aiming 20 to 30 degrees downward. Here, the empty shell casings strike the ground 5 to 7 feet to the right of point zero and 5 to 7 feet behind it. The 20 shots show a fairly consistent range of variability but always to the right and always behind the shooter. Doc. 79-3, Balash Report, pages 9-10.

In his scene diagram, Deputy Embry places himself more toward the base of the fallen sapling where he says he stopped and fired. In a circle drawn by Mr. Balash at his deposition at the request of counsel for the Defendants, Mr. Balash places Deputy Embry nearer the tip of the sapling, closest to the body, with the shell casings, marked "3" and "4" on little yellow markers about midway along the sapling, a few feet to the right of Mr. Balash's blue circle. According to the cartridge ejection tests, the location of the cartridges is consistent with the Balash theory of where the shooter stood, and inconsistent with where Deputy Embry said he stood. If Deputy Embry had been standing near the tip of the sapling, where the small branches offered no obstacle to movement, close to the body, and especially if he had been firing at a downward angle, the cartridge casings could have ended up where they were found. If Deputy Embry were standing where he claims, they could not.

Mr. Rini's only response to Mr. Balash's meticulous tests is to cite and produce an article that suggests that in repeated shell cartridge ejection pattern tests using a

variety of weapons, one-fourth of the shell casings ended up other than to the right and rear of the shooter. The lead author of the article was written by a police psychologist, not a ballistics expert, whose bread and butter is defending police and police agencies in litigation. Dr. Lewinski claims a 1988 Ph.D from The Union for Experimenting Colleges and Universities, an Ohio-based "distance learning" institution, now re-christened Union Institute. In 2002, the Ohio Board of Regents released a Reauthorization Report stating that ". . . expectations for student scholarship at the doctoral level were not as rigorous as is common for doctoral work." [http://en.wikipedia.org/wiki/Union_Institute_%26_University](http://en.wikipedia.org/wiki/Union_Institute_%26_University). Dr. Lewinski was prevented from offering his opinions on spent shell casings locations in *Tubar v. Clift*, 2:05-cv-01154-JCC (W.D. Wa. 2005), Doc. 346, **Exhibit D**, because the court found Dr. Lewinski unqualified by education or experience to give such opinions.

### 4. Other Comments and Criticisms by Mr. Rini

Each of Mr. Rini's other criticisms of the reports of Plaintiff's experts appears to be thrown out in an off-hand manner with no effort to connect the opinions to the facts. They are nothing more than a series of conclusory, unfounded, statements having no potential to affect the outcome. Such conclusory testimony should be rejected by the Court. *See McDowell v. Brown*, 392 F. 3d 1283 (11th Cir. 2004).

Because federal courts must sit as gatekeepers of expert testimony, *Daubert,* 509 U.S. at 591, this Court should exclude such testimony and opinions from a jury. Commentary which lacks any explanation is inappropriate because, "the Eleventh

Circuit 'has consistently held that conclusory allegations without specific supporting facts have no probative value.'"*Bloodsworth v. Smith & Nephew, Inc.*, 476 F. Supp. 2d 1348, 1354 (M.D. Ala. 2006).

In regard to Rini's conclusions on Embry's account, "… a trial court may exclude testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Owaki v. City of Miami*, 491 F. Supp. 2d 1140, 1161 (S.D. Fla. 2007). Because Mr. Rini's conclusions as to the veracity Embry's account are not backed by supporting evidence, they should be excluded. In keeping with its gatekeeping function, "the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id.* The conclusions and statements made within the expert report certainly have this potential, especially due to the fact they lack factual basis and explanation.

Here, Mr. Rini's conclusion that the facts are consistent with Deputy Embry's testimony violates Rule 702, Fed.R.Evid. (Testimony must be based on sufficient facts or data). Neither do they meet the reliability test set forth in *McDowell* and *Daubert*. Mr. Rini's opinions are neither grounded upon scientific principles, nor are they based upon "knowledge" as set forth in *Daubert* and its progeny. *McDowell*, at 1298 (Testimony "must constitute 'knowledge,' meaning something more than subjective belief or unsupported assumptions."). Stated another way, this is a case where there is too great an analytical leap between the actual facts and the resulting expert's opinion. *Id.* at 1298-99. In other words, if this Court meticulously focuses on the expert's

principles and methodology, and not the conclusions that were generated, Mr. Rini's opinions should be excluded as unreliable. *Id.* at 1298-99.

Mr. Rini must not merely poke at the conclusions reached by Plaintiff's experts, but, as *McDowell* makes clear, the scientific evidence must 'fit' the defendants' theory of the facts. In this case, none of Mr. Rini's theories 'fit' the critical evidence.

WHEREFORE, Plaintiff moves this Honorable Court to exclude under *Daubert*, or severely limit, pursuant to Rules 26(a)(2)(B) and 37(c)(1), Fed.R.Civ.P., the testimony offered by Defendants' Expert Gary Rini in this case.

          Respectfully Submitted,

          *s/ James V. Cook*
          James Cook, FBN 0966843
          Law Office of James Cook
          314 West Jefferson Street
          Tallahassee, FL 32301
          Telephone: (850) 222-8080
          Facsimile: (850) 561-0836
          cookjv@nettally.com

          For Plaintiff

I CERTIFY that I did confer with opposing counsel on the relief requested herein pursuant to Local Rule 7.1 and opposing counsel does object to the relief sought.

I CERTIFY that a copy of the foregoing has been furnished by CM/ECF on May 20, 2013, to all counsel of record.

        *s/ James V. Cook*